## Case No. 12,404.

SAWYER et al. v. OAKMAN et al.

[1 Lowell, 134.] [1]

District Court, D. Massachusetts. March, 1867. [2]

WHARVES — INEQUALITIES IN BOTTOM — INJURY TO VESSEL — WORK ON SUNDAY — MASSACHUSETTS STATUTE.

1. The owners of a dock are responsible for damage suffered by a vessel lawfully using the dock, and caused by a defect in the bottom, known to the owners of the dock and not known to the master of the vessel.

[Cited in Union Ice Co. v. Crowell, 5 C. C. A. 49, 55 Fed. 88.]

2. Where a vessel hauled into a dock in the harbor of Charlestown on a Sunday, against the law of the state, which prohibits work on that day, under a penalty, her owners are entitled to recover damages caused by a defect of the dock, whether they were suffered on the Sunday or on the next Monday.

3. The effect which the statute of Massachusetts, prohibiting work on the Lord's day under a penalty, shall have on the rights of the parties to a collision cause, pending in the district court, one of whom has violated the act in moving his vessel on that day, is not a question of the construction of the statute, but of the application of general rules of law to the case of a person who has violated such a statute, and the district court must follow the decisions of the supreme court of the United States, and not those of the state tribunals.

4. The case of Philadelphia R. Co. v. Philadelphia Steamboat Co., 23 How. [64 U. S.] 209, decides that such a violation of a Sunday law is no bar to a proceeding for damages by collision.

[This was a libel by Charles Sawyer and others against Samuel Oakman and others to recover damages for injury sustained by libellants' boat.]

F. C. Loring and John Lathrop, for libellants.

J. C. Dodge, for respondents.

LOWELL, District Judge. The libellants are the owners of the schooner Bowdoin, and the respondents own a wharf and dock at Charlestown. In October last, the schooner, loaded with a full cargo of coal, arrived in port consigned to the respondents, and at the request of the latter, made fast at one of the piers of the wharf, and awaited for some days the discharge of two other vessels which had an earlier right to the berth. On Saturday, the master attempted to haul into the dock, which was then clear, but failed, and did haul in, at high tide, in the afternoon of Sunday. On Monday morning it was discovered that the vessel was badly hogged and strained, causing a damage estimated, in the libel, at ten thousand dollars, for which the owners are now proceeding. The libellants attribute the damage to the bad state of the dock, which, they say,

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[2] [Affirmed in Case No. 12,402. Decree of circuit court affirmed by supreme court; unreported.]

had a large pile of coal in it and was otherwise dangerous. The respondents aver, that the injury resulted from the negligence of the master in not hauling to the place pointed out to him for that purpose, and in not putting in suitable fenders. It seems that the dock has two berths, of which the upper or inner berth is much shallower than the other, and is intended for vessels that take the ground at low tide; and the theory of the defence is, that the vessel lay partly in one and partly in the other, and so did not rest wholly upon the ground at low tide; and she had a considerable list outwards, or to port, which is alleged to have been caused by the master's negligence; and the damage is attributed, by them, to one or both of these causes. They further set up, as a matter of law, that the master, in removing his vessel on Sunday, was acting illegally under the statutes of Massachusetts, and cannot recover for any injuries received by or in consequence of doing such an act.

Much evidence has been given, on both sides, concerning the size of the pile of coal which had slid into the dock some days before. The witnesses for the libellants estimate it at twenty tons, and say it reached into the keel bed; while on the other side it is reduced to a very much smaller size, and said to have ended short of the place where vessels ordinarily lie. There has also been much controversy upon the question whether the master should have hauled farther ahead. It seems that he and the mate were told that they were to take the berth which the vessel just discharged, called the Daybreak, had occupied; and that a landing stage was pointed out to one or both of them as the point to which they were to bring the main-hatch of their schooner. This landing stage was movable, and after the Daybreak was discharged it was hauled inward from the edge of the wharf to allow her to pass out, and was twisted round so that its lower end was some feet farther down the dock than it had been when the Daybreak was discharging. To this end of the stage, as thus situated, the master hauled the upper corner or line of his main-hatch, which he says is a substantial compliance with the directions given him. Finally, it is said on the one side, that the listing of the vessel shows that the master had not put in suitable fenders, and that this may be one chief or even the sole cause of the strain to his vessel. On the other it is declared, that he put in the usual fenders, and that if larger fenders were required the wharfinger should have notified him.

Upon these much-contested points I am of opinion, upon the preponderance of the evidence, that the damage was probably caused by the vessel's resting on the pile of coal, though this point is by no means clear. But if not, yet that the master complied substantially with the directions of the wharfinger in placing his vessel as he did, and

that he put in the usual fenders. He was not warned of any danger, nor that there was any reason for his hauling to any particular spot, except the convenience of discharging his vessel at that berth, which was the real and only object of the notice, nor of the necessity for larger fenders, and in hauling, as he did, to a place within reach of the landing stage and suitable for discharging, and in fending in the usual way, he exercised due care and skill; for I agree, that without special notice he would not be bound to more than usual care either in placing his schooner or in making fast.

It is clear, that if the vessel was properly navigated and made fast, the injury must have resulted from some defect in the respondents' dock, and this is hardly denied. Now, whether the defect was of the kind supposed by the one side or by the other, appears to me immaterial, because in either case the respondents must be presumed to have known of it, since the pile of coal had been there for some days, and the inequalities in the bottom of the dock for some years. And upon principles recognized alike at common law and in the admiralty, the owners of the dock and wharf making use of it for gain in the course of their business, would be liable for the damages arising from such defects to a person lawfully using the dock in the course of business and·in the exercise of due care. Philadelphia R. Co. v. Philadelphia Steamboat Co., 23 How. [64 U. S.] 209; Parnaby v. Lancaster Canal Co., 11 Adol. & E. 223; Mersey Docks & Harbour Board Trustees v. Gibbs, L. R. 1 H. L. 93. It remains to inquire whether the libellants are in a condition to recover this damage. They hauled in on a Sunday, not at the end of a voyage, but in order to be in a position to save a tide on Monday. It is alleged in the libel that the position of the schooner was somewhat dangerous where she lay on Saturday, from which it might be inferred to be a work of necessity to move her. But the evidence does not bear out this allegation, and it was abandoned at the argument. Another objection taken is that the damage was not done on Sunday. It seems that the injury was not apparent to the master at ten o'clock at night, which was after low water; the vessel, from the depth of her draft would be aground not only at low water, but during a great part of the rising and falling of the tide, so that she was in a position to suffer damage during several hours of Monday (which begins at midnight), as well as during a part of Sunday, and it is argued that I ought not to infer, in the absence of evidence, that the injury was, in fact, done on Sunday. I am much inclined to this opinion. But it may be doubted whether the burden of proof would not be on the libellants to show that they were lawfully using the dock when the damage was sustained; and, if so, the mere absence of inference either way might not be enough

for them, if the original act of hauling in on Sunday puts them in the wrong. It may be said that, as there was no appearance of strain or injury when the captain went to bed on Sunday night, and none such was discovered until six or seven o'clock in the morning, the inference may fairly be drawn that it occurred after midnight.

And this again may be so; but as the question is one of fact, and in which there is great liability to mistake, I have thought it my duty to look at the point of law on the supposition, for the purposes of this opinion, that the damage was done on Sunday. It can hardly be denied that the act of hauling in on the Lord's day was an illegal act under the statute of Massachusetts, cited at the bar, which prohibits the performance of work and labor on that day, excepting in case of necessity; and cases were cited from the Massachusetts reports more or less analogous to this, and especially the important and leading case of Gregg v. Wyman, 4 Cush. 322, which tend to show that a plaintiff who is obliged, as part of his case, to found himself upon such an act, cannot recover damages of a defendant who is likewise in the wrong. But without examining the authorities, or the reasons on which they rest, with critical attention, and assuming that no action analogous to this could be maintained in the courts of Massachusetts, I yet feel constrained, whatever my judgment might be upon the question, if new, to follow the decision in 23 How. [64 U. S.] 209, above cited. That was a case very similar in its circumstances to this, and a statute of Maryland almost identical with ours was relied on, but the supreme court sustained the action. It is true that a doubt is expressed by the court, whether the act of beginning a voyage on Sunday was intended to be prohibited by the statute; but it is equally true that they express a very decided opinion, that, if it were, yet the action for damages against a wrong-doer would not be barred thereby.

And I do not feel at liberty to overlook one point of their opinion more than the other. Indeed, of the two, the latter doctrine appears to be the more relied on in the judgment. This is not one of those local questions in which the admiralty courts are bound to follow the state decisions. In the first place, the thirty-fourth section of the judiciary act of 1789 [1 Stat. 73], which provides that the laws of the several states shall be regarded as rules of decision in the courts of the United States, in trials at common law, does not in terms apply to trials in the admiralty; and on this ground Judge Story intimated an opinion that statutes of limitation would not bar actions in such courts, and this has remained the established doctrine, as appears, among other things, by the fact that state rules of evidence have never governed in the admiralty until the passage of a recent act of congress. So that the question which rule I am bound to follow, depends on whether this is a case which by general principles is governed by the local law. Now to the extent of holding that work done in contravention of the statute is illegal, it may be that the local law should govern, but the statute itself is silent concerning the legal consequences of doing such an act excepting to the extent of the penalty directly imposed. The effect which it may have on the wrong-doer's standing as regards third persons is no part of the construction of the statute, but the application of a general principle of law. Thus in Gregg v. Wyman [supra], it was decided upon general principles, as derived in a great measure from English cases, that a wrong-doer could have no right of action when he was obliged to claim through his wrongful act. The fact that the act was prohibited by a state statute, had nothing to do with that part of the case; it might as well for all the purposes of the decision have been one which was illegal at common law or by a statute of the United States. This libel is for a marine tort, committed within the ebb and flow of the tide, and although within the body of a county, yet the rights of the parties depend upon the law as administered in the admiralty. To take a very common example, let us suppose that instead of an illegal act, contributory negligence of the master were shown, it is clear that the damages would be divided in this court, although by the law as administered in the state courts, the plaintiff could not recover any damages. For these reasons, it appears to me to be my duty, without discussing the main point upon principle, to follow the decision, or very strongly expressed opinion of the supreme court, and to pronounce for the damage. Decree for the libellants.

[NOTE. This case was taken to the circuit court by appeal, and, Mr. Justice Clifford being related to one of the parties, the case was removed to the Second circuit, where the decree of this court was affirmed. Case No. 11,402. The original respondents appealed to the supreme court, where the decree of the circuit court was affirmed (unreported). On the presentation of the mandate of the supreme court, final judgment and award of execution was entered in the circuit court, ex parte, against the orignal respondents, and a summary judgment against Lee and Davis, as sureties on the appeal to the circuit court. Under this execution, the body of Lee was taken. Lee thereupon moved to set aside the execution. Upon a hearing in the circuit court the execution was set aside. Id. 12,403.]